UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JAMES HARVEY, JR.,

                                        Petitioner,

          vs.                                        9:01-CV-1116
                                                     (J. Mordue)

HANS WALKER,
Superintendent,

                                        Respondent.

_____

APPEARANCES                             OF COUNSEL

JAMES HARVEY, JR.
Petitioner pro se
96-B-765
Auburn Correctional Facility
135 State Street
P.O. Box 618
Auburn, New York 13024-9000

ELIOT SPITZER                           MARIA MORAN
Attorney General of the                 Asst. Attorney General
State of New York
Attorney for Respondent
615 Erie Boulevard West
Suite 102
Syracuse, New York 13204-2455

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

     This matter has been referred to me for Report and Recommendation by the

Honorable Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C.

§ 636(b) and Local Rules N.D.N.Y. 72.3(c).

Petitioner has brought this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner complains of a judgment of conviction of the Onondaga County Court, entered on March 20, 1996, after a jury found petitioner guilty of Manslaughter, First Degree. Petitioner was sentenced to a term of 12½ to 25 years imprisonment. The Appellate Division, Fourth Department affirmed the conviction on March 29, 2000. *People v. Harvey*, 270 A.D.2d 959, 706 N.Y.S.2d 562 (4th Dep't 2000). The New York Court of Appeals denied leave to appeal on June 19, 2000. *People v. Harvey*, 95 N.Y.2d 835, 713 N.Y.S.2d 142, 735 N.E.2d 422 (2000).

Prior to completing his direct appeal, petitioner moved to vacate his conviction pursuant to N.Y. CRIM. PROC. LAW § 440.10 in the Onondaga County Court. That motion was denied on June 24, 1998 and again denied on reconsideration on August 4, 1998. Petitioner's Ex. I, J. Petitioner applied for leave to appeal both decisions and leave was denied by the Appellate Division, Fourth Department on September 30, 1998 and October 21, 1998. Petitioner's Ex. K, L. The New York Court of Appeals dismissed petitioner's application for leave to appeal the Appellate Division's September 30, 1998 order because no appeal was available. Petitioner's Ex. M.

Petitioner also moved for a writ of error *coram nobis* in the Appellate

Division, Fourth Department, alleging ineffective assistance of appellate counsel.

Petitioner's application was denied on June 8, 2001. *People v. Harvey*, 284 A.D.2d

1022, 726 N.Y.S.2d 43 (2001).

Petitioner raises three claims for this court's review:

1.    Petitioner received ineffective assistance of trial counsel.

2.    The prosecutor committed misconduct, and the trial court was biased
      and erred in various rulings.

3.    Petitioner received ineffective assistance of appellate counsel.

Respondent argues for denial of the petition and has filed an answer and

memorandum of law together with the pertinent state court records.[1] (Dkt. Nos. 8,

9).  Petitioner has filed a traverse. (Dkt. No. 11).  For the following reasons, this

court agrees with the respondent and will recommend dismissal of the petition.

## DISCUSSION

## 1. Facts

The manslaughter conviction in this case arose from the beating death of

---

[1] The state court records are listed on pages 2-4 of the respondent's answer. (Dkt. No. 8).  The records have been labeled with exhibit numbers 1-30.  The *Molineaux* hearing and trial transcripts (Respondent's Exhibits 2 and 3) consist of eight volumes.  The court will refer to specific pages of the *Molineaux* and trial transcripts only with the prefix (T).  Petitioner has also submitted exhibits that are identified by a letter.  The court will refer to shorter state court documents by either respondents exhibit number or petitioner's exhibit letter.

Yvonne Sullivan on August 2, 1995.  Petitioner and Ms. Sullivan lived together at

414 Hawley Avenue in Syracuse, New York.  Terri Ann Allen, a Senior Paramedic

for Eastern Ambulance Company testified that shortly after 9:00 a.m. on August 2,

1995, a telephone call was received, stating that there was an unconscious diabetic

at 414 Hawley Avenue. Trial Transcript (T) at 602-03.  Ms. Allen's ambulance

responded to the call, and the paramedics were met by petitioner when they arrived.

(T. at 603).

Petitioner took the paramedics upstairs to his apartment, and Ms. Allen

testified that when she got to the bedroom, she saw Ms. Sullivan lying face-up on

the bed with part of her torso on the bed and her legs sticking straight out from the

bed, indicating that rigor mortis had begun to occur. (T. at 604-05).  Ms. Allen

testified that the victim's condition indicated that she had been moved to the bed

after her death. (T. at 605).  Ms. Sullivan was wearing only a pair of panties, there

was a gash in her forehead, swelling around her eyes, abrasions to her face, and she

was a pale bluish color. (T. at 606).

Ms. Allen testified that petitioner initially told Ms. Allen only that he found

Ms. Sullivan on the floor when he woke up. (T. 613).  Petitioner told Ms. Allen that

Ms. Sullivan was a diabetic, and that he tried to test her blood sugar, but when he

4

was unable to do that, he went out[2] and called 911. (T. at 613-14).  Later, Ms. Allen

attempted to elicit some more information from petitioner, and he then stated that he

had come home around midnight and had seen Ms. Sullivan in the bedroom with

other people. (T. 618).  Petitioner told Ms. Allen that he became upset and did not

want anything to do with Ms. Sullivan, so he got a forty ounce beer from the

refrigerator and ultimately fell asleep on the couch.  Petitioner told Ms. Allen that

when he woke up, he found Ms. Sullivan. (T. at 618).  He also stated that he

initially found Ms. Sullivan nude on the floor with a vacuum cleaner cord wrapped

around her. (T. at 620-22).  Ms. Allen also testified that petitioner told her that he

was angry because he also found a used condom on the floor. (T. at 621).  While

petitioner was telling Ms. Allen the story, he asked "'what am I supposed to do'"

(T. at 621).  Petitioner told Ms. Allen that he cleaned Ms. Sullivan up, put panties

on her, and put her on the bed. (T. 622)

When the police arrived, Ms. Allen notified an officer that she believed Ms.

Sullivan's death was "suspicious." (T. at 622).  One of the officers asked petitioner

what happened, and Ms. Allen stated that petitioner gave the officer the "same"

information. (T. at 622).  Ms. Allen also told the officer that there were some

discrepancies in petitioner's statements. (T. at 622-24).

---

[2] Petitioner later told Ms. Allen that he had no telephone in the apartment.

5

Lieutenant Mark McArdle of the Syracuse Police Department testified that the police took petitioner downstairs to the back seat of one of the police cars, and petitioner, although not under arrest at that time, was advised of his rights. (T. at 759, 762-64). McArdle then stated that he spoke briefly to petitioner while he was in the back seat of the car, but wanted to take him down to the police station for a proper interview. (T. at 765-66).

After petitioner was brought to the police station, he spoke to several officers at different times during the day of August 2, 1995. At approximately 6:30 that evening, petitioner was interviewed by Detective Henry Burns and his partner Detective John Barnum of the Syracuse Police Department. (T. at 820-23). Detective Burns testified that when he and his partner entered the room, he noticed that petitioner had been offered food and drink during the day. (T. at 823). At that time, the officers were aware that Ms. Sullivan's death had been classified a homicide. (T. at 824). The classification was made by the medical examiner between 2:40 and 3:10 in the afternoon of August 2, 1995. (T. at 802). Detective John Brennan of the Syracuse Police Department had already informed petitioner that Ms. Sullivan's death had been classified as a homicide. (T. at 805). Detective Brennan testified that petitioner ***never*** indicated that he wished to stop talking to the police. (T. at 806).

6

Detective Burns asked petitioner what he had done on August 1, 1995, and petitioner began to relate more information regarding the time surrounding Ms. Sullivan's death.  Detective Burns testified that petitioner stated that he had come home after 5:00 p.m. after working most of the day. (T. at 824).  Petitioner told Burns that when he got home, he found Ms. Sullivan with two of her girlfriends, Lourie and Kim, both alleged prostitutes.  Burns stated that petitioner told him that he drank beer with the three women, there was some conversation between them, and when they finished the beer, petitioner went out to get more. (T. at 824).

Petitioner also told Detective Burns that he got into an argument with Ms. Sullivan, and during the course of the argument punched her, knocked her to the ground, and kicked her. (T. at 825).  Petitioner told Burns that after the argument, petitioner left the apartment and went out to the front porch to drink some more. (T. at 825).  Petitioner told Burns that he went to bed shortly after 11:00 p.m., woke up sometime between 7:30 and 7:45 a.m., and found Ms. Sullivan dead. (T. at 826).  Burns then stated that as he was going over these facts with petitioner, petitioner became more evasive, and then became emotional, stating that he really cared for Ms. Sullivan, but that she was "messing around" with a lot of his friends and relatives. (T. at 827).  Petitioner told Burns that he struck Ms. Sullivan a "couple of times with his hand," and when she fell to the ground, he began kicking her around

7

her chest and stomach, but he could not be specific as to how many times he kicked her. (T. at 827, 828).  Petitioner just stated that he kicked and punched her and then he left the apartment. (T. at 827).

Petitioner told Detective Burns that when he woke up the next morning, he found Ms. Sullivan lying on the floor, he picked her up, tested her blood sugar, and then left the apartment to go to the corner store and call 911. (T. at 829).  Petitioner also told Detective Burns that it was not unusual for petitioner to come home and find evidence of men in the apartment. (T. at 829).  Petitioner told Detective Burns that when petitioner got home on the night of August 1, 1995, he suspected that someone had been in the apartment because he found a broken coat rack and found either a condom package or the used condom itself on the floor by the bed. Petitioner told Detective Burns that petitioner had confronted Ms. Sullivan about this, and that she had admitted there was someone in the apartment while he was at work. (T. at 830).

Detective Burns testified that he and petitioner went over petitioner's statement four or five times, and that sometime after 9:00 p.m. on August 2, 1995, Detective Burns asked petitioner to give the police a written statement. (T. at 831). Petitioner agreed. (T. at 831).  Detective Burns testified that as part of the written statement, Detective Burns advised petitioner of his rights. (T. at 832).  Detective

8

Burns also testified that petitioner never told Burns that he wished to stop speaking or that he wanted an attorney present, but rather that petitioner was "very cooperative." (T. at 834).

After informing petitioner of the rights that were typed on the cover sheet of the affidavit form, Detective Burns typed petitioner's statement, stopping from time to time as he was typing to read the sentences to petitioner and ask if the statements were correct. (T. at 837).  Each page of the statement was signed by petitioner. (T. at 837-39).  When Detective Burns finished typing the statement, he gave petitioner the opportunity to read it again, and Detective Burns told petitioner to let him know if Burns needed to make any changes or corrections. (T. at 840).  Petitioner's statement was admitted into evidence at the trial and read to the jury. (T. at 840-41).

The prosecution introduced the testimony of many other witnesses.  Samuel Livingstone, the Assistant Medical Examiner for Onondaga County, testified that Ms. Sullivan died from internal bleeding due to multiple liver lacerations, resulting from blunt force trauma. (T. at 979).  He testified that there was a substantial amount of blood in the abdominal cavity, and that the degree of injury to the liver could have been caused by a shoe "coming down flat" on the victim in the abdominal area. (T. at 982).  Mr. Livingstone also testified that there was ***no evidence*** that Ms. Sullivan's diabetes contributed to her death. (T. at 983).

9

The prosecution also introduced testimony from neighbors, friends, and relatives who had seen petitioner either arguing with or striking Ms. Sullivan prior to the day of her death.  One of Ms. Sullivan's friends, Tammi Lobdell, from whom Ms. Sullivan bought drugs, testified that one day she watched as petitioner slammed Ms. Sullivan's head into a wall during an argument. (T. at 895).  David Hannah, an individual who owned a business across the street from Ms. Sullivan's and petitioner's apartment testified that he had seen petitioner punch Ms. Sullivan prior to the day of her death. (T. at 706-08).

Mr. Hannah also testified that between 7:30 a.m. and 8:00 a.m. on August 2, 1995, he saw petitioner walking around the neighborhood. (T. at 698-99).  Mr. Hannah stated that petitioner talked to some people, stopped to say good morning to Hannah, and asked Hannah for a cigarette. (T. at 699-700).  Mr. Hannah then stated that at approximately 8:45 a.m., he went back into his business to start work, and shortly thereafter he heard the ambulance across the street. (T. at 702).

Kimberly Milks, another of Sullivan's neighbors testified that on August 1, 1995, petitioner and Ms. Sullivan asked to use Milks's telephone, but that she told them the telephone had been disconnected. (T. at 667-69).  Ms. Milks stated that Ms. Sullivan looked "fine" but that petitioner looked "drunk and high." *Id.*  Ms. Milks stated that she saw petitioner again at approximately 3:30 a.m. on August 2,

1995. (T. at 669).  He was carrying a light brown bat that was split, and he was mumbling something about doing what he had to do, coming home with the sheets "messed up," and loving "her." (T. at 671-72).  Ms. Milks testified that she asked petitioner where Ms. Sullivan was, but petitioner did not respond. (T. at 672).  Ms. Sullivan's mother, Bobbie Trotman, also testified regarding times when she had to go pick up her daughter because she had been so badly beaten or when Ms. Trotman went to her daughter's house and noticed that she had a black eye, bruises on her face, and could not walk properly. (T. at 939-41).

Ms. Sullivan's father, Juan Trotman, testified that he had run into his daughter approximately one week prior to her death and noticed that she was very thin and had a black eye. (T. at 947).  Mr. Trotman stated that he made arrangements to go over to his daughter's home, but had never met petitioner prior to that time. (T. at 947).  After Mr. Trotman arrived at petitioner's and Ms. Sullivan's apartment, Trotman had a conversation with petitioner, and asked petitioner why he hit Ms. Sullivan. (T. at 950).  Mr. Trotman testified that petitioner told him that "sometimes he just loses his temper and he just doesn't know what he's doing, and he's afraid that he might kill her." (T. at 950).  This conversation occurred approximately five days prior to Ms. Sullivan's death. (T. at 947).

David "Scoop" Neal, a friend of petitioner's and Ms. Sullivan's testified that

on August 1, 1995, Ms. Sullivan asked Neal to come into her apartment and smoke some crack cocaine. (T. at 927).  Neal stated that when he went upstairs, he saw two white girls, Lourie and Kim, and a black male, KY, in the apartment. (T. at 927-28).  Neal stated that the group sat around and talked. (T. at 928).  Neal stated that he left approximately five minutes later at approximately 1:30 or 2:00 p.m. (T. at 928).

Later that day, Neal returned to Sullivan's apartment, and petitioner was home at that time. (T. at 929).  Neal stated that petitioner became upset with him because he was unhappy that someone was "coming there while he wasn't there." (T. at 930).  Neal stated that petitioner began arguing with Neal and telling him he wanted to fight. (T. at 929).  Mr. Neal stated that he backed off and left the apartment again, only to return to the area at approximately 9:00 or 10:00 p.m. to go to the store. (T. at 929).

Neal stated that at that time, petitioner was on the front porch of his house, and began arguing with Neal again because petitioner believed that Ms. Sullivan had been with Neal "sexually." (T. at 930).  Neal stated that petitioner told Neal that he "didn't really care what happens now because she's not going to play any more." (T. at 930).  Neal testified that petitioner was carrying a bat and told Neal that he did not care about Sullivan any more, and that Neal was "not going to be playing with her no more [sic], [petitioner's] going to make sure of that." (T. 930-31).  Neal

stated that petitioner "had the stick" so Neal went out and obtained a "stick" down the street, but that by the time he returned to petitioner's house, petitioner would not come off the porch, and so Neal left his "stick" up against a fence and left the area at approximately 11:00 p.m. (T. at 931-32).

Timothy Whitley, one of petitioner's neighbors and his employer at the time of the crime also testified for the prosecution. Petitioner was working with Mr. Whitley on a construction job on August 1, 1995. (T. at 653-54). Mr. Whitley testified that after he went to bed at 11:00 p.m., he heard petitioner pounding on Whitely's door. (T. at 653-54). Mr. Whitley stated that petitioner was saying something about using the telephone. (T. at 654). Petitioner returned to Mr. Whitley's door at 1:30 a.m., requesting that Whitley come out to help petitioner with some individuals who were trying to beat him up. (T. at 655-56).

Although Mr. Whitley never answered the door that night, he stated that he looked out of his window and saw two men throw a bottle, but did not see petitioner or Ms. Sullivan. (T. at 657). Mr. Whitley did state, however, that he knew petitioner was outside his door because he recognized his voice. (T. at 657). On the morning of August 2, 1995, Mr. Whitley was scheduled to give petitioner a ride to work, and Whitley testified that he stopped at petitioner's house just before 7:00 a.m., but was not able to get any response from anyone in the house. (T. at 658).

13

Syracuse Police Officer Gary Pratt testified that twenty two items of evidence were recovered from petitioner's apartment on August 3, 1995. (T. at 735).  A condom **wrapper** was recovered from on top of the television set in the bedroom, but **no used condoms** were recovered from anywhere in the apartment. (T. at 736). He also recovered a baseball bat that was leaning up against a wall next to the coat rack in the livingroom. (T. at 737-38).

Timothy French, a forensic chemist for the Syracuse Police Department testified that the police used a sexual assault kit to test for the presence of semen. (T. at 748).  No semen was recovered from Ms. Sullivan's body. (T. at 750). Human blood was detected on the bat, on some sheet rock from the bedroom wall, and on petitioner's sneakers, but there was no testimony regarding whose blood it was. (T. at 753-56).

Although petitioner did not testify, his defense was that he was innocent of the crime, and that another man had raped, beaten, and killed Ms. Sullivan. Petitioner attempted to introduce the testimony of two witnesses that petitioner thought would exonerate him because they had heard another individual admit to the crime.  Petitioner wished to present the testimony of Kimberley Johnson, who allegedly heard Cicero (Verne) Dixon admit raping and beating Sullivan.

Kimberley and Lourie Johnson were the two women who were with Ms.

14

Sullivan in her apartment the day that she was killed. (T. at 1024-25).  Kimberley

Johnson stated that she remembered a variety of people who were also in the

apartment that day, including "Scoop," KY, and "Verne." (T. at 1026).  Verne was

Cicero Dixon. (T. at 1026).  Kimberly Johnson testified that petitioner came home

at approximately 5:00 p.m., and that she was "in and out" through the day, but when

she finally left at 11:00 p.m., Verne, petitioner, Sullivan, and other individuals were

out on the corner. (T. at 1028).  Ms. Johnson testified that she went to Tammi

Lobdell's apartment at about 4:30 or 5:00 a.m. on August 2, 1995. (T. at 1028).

Ms. Johnson testified that she was outside Tammi Lobdell's apartment when Cicero

(Verne) Dixon came through a short cut from Hawley Avenue to Burnet Avenue

and asked Ms. Johnson to call him a taxi. (T. at 1029).  Johnson stated that she

spoke to Mr. Dixon for approximately 15 to 20 minutes. (T. at 1029).

At that time, the prosecutor objected to hearsay testimony, and the court

listened to some of Ms. Johnson's testimony in chambers as an offer of proof. (T.

1030).  In chambers, Ms. Johnson testified that Mr. Dixon told her that when he

was in Sullivan's apartment, he sent petitioner out to get some crack cocaine, but

that it took too long, and Sullivan did not have any money to pay him, so he made

her have sex with him, and stated to Ms. Johnson that he "fucked her to death and

she was going into a seizure and he left." (T. at 1031).  He allegedly told Ms.

15

Johnson that he used condoms, but did not say whether he had left them. (T. at 1031). The court then asked Ms. Johnson if she interpreted Mr. Dixon's comment literally, and Ms. Johnson stated that it meant that Mr. Dixon "had a good time", but that she did not interpret Mr. Dixon's comment to mean that he had ***actually*** caused her death. (T. at 1033). The court found that the statement by Mr. Dixon was hearsay, and did not fit into the exception for declarations against penal interest. (T. at 1034-35). Thus, the court limited Ms. Johnson's testimony and would not let her testify regarding the statement that Mr. Dixon made about Ms. Sullivan. (T. at 1035).

Anther offer of proof was made regarding additional testimony by Ms. Johnson, and the court denied its admission. (T. at 1038-46). Essentially, Ms. Johnson was going to testify that Ms. Sullivan had relationships with other individuals who were violent with her between 1993 and 1995, including Cicero Dixon. *Id.* The court excluded this testimony also. (T. at 1046). An attempt to locate Cicero Dixon for trial failed. (T. at 1050-53).

Petitioner also presented the testimony of Timothy Kelly, Tammi Lobdell's boyfriend, who stated that between 4:00 a.m. and 6:00 a.m. on the morning of August 2, 1995, Cicero Dixon was pounding on Kelly's door. (T. at 1001, 1003). Kelly knew Dixon because Kelly purchased drugs from Dixon. (T. at 1008). Kelly

16

testified that Dixon looked "real scared and his eyes were real big and he was
sweating." (T. at 1003).  Kelly stated that he spoke to Dixon for about seven
minutes, although the court would not let Kelly state the substance of the
conversation. (T. at 1004).  Kelly stated that Mr. Dixon was looking for a car, but
Kelly stated that he could not get one, and Mr. Dixon "ran off down the street." (T.
at 1004).  Mr. Kelly also testified that he spoke to the police about the incident later
and that he identified a picture of Mr. Dixon as the individual who came to his door
on the morning of August 2, 1995. (T. at 1006).  Mr. Kelly also testified that in the
early winter of 1995, he was aware that Mr. Dixon physically and sexually
assaulted Kimberly Johnson. (T. at 1007).  On cross-examination, however, Mr.
Kelly, after denying that Dixon lived with him and his girlfriend, admitted that
Cicero Dixon occasionally stayed in the same apartment with Kelly and Lobdell. (T.
at 1009). Lobdell had testified earlier that Dixon "lived" with them. (T. at 891).
Cicero Dixon never testified.

## 2.  **Standard of Review**

The standard of review in a habeas action depends upon whether the state
court considered petitioner's constitutional claims "on the merits."  The
Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a
federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. §

2254 unless the state court ruling ***on the merits*** of a federal constitutional issue was either "'"contrary to ... clearly established Federal law' or 'involved an unreasonable application ... of clearly established Federal law.'" *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001)(quoting 28 U.S.C. § 2254(d)(1))(alterations in original). The statute further provides that the court may grant a writ of habeas corpus when a claim that was considered on the merits by the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 107-13 (1995). When presented with these questions, the court was empowered to conduct an independent review of the record. *Id.* The factual findings of the state court, however, were presumed to be correct absent circumstances listed in the statute, such as cases in which the factual finding was not fairly supported by the record. 28 U.S.C. § 2254(d) & (d)(8). The AEDPA requires the court to apply a more deferential standard, placing new restrictions on the power of federal courts to grant writs of habeas corpus to state inmates. *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

In order to apply the AEDPA standard, the petitioner's claim must have been

18

"adjudicated on the merits" in the State court proceedings. 28 U.S.C. § 2254(d)(1).

Additionally, the AEDPA provides that a state court's fact findings are presumed

correct, unless that presumption is rebutted by clear and convincing evidence. *Id.*

§ 2254(e)(1). If the State court has failed to adjudicate a claim "on the merits", the

pre-AEDPA standard of review applies, and the court reviews both questions of law

and mixed questions of law and fact *de novo. Washington v. Shriver*, 255 F.3d 45,

55 (2d Cir. 2001).

### 3. <u>Ineffective Trial Counsel</u>

Petitioner did not raise ineffective assistance of trial counsel on appeal, rather

he raised this claim in his section 440.10 motion to vacate which was filed and

decided prior to his direct appeal. The County Court judge stated that "the

defendant's claims as to his attorney's conduct do not demonstrate ineffective

assistance of counsel." Petitioner's Ex. I at p.2. The court also stated, however, that

"[t]o the extent that the claims are based upon conduct at trial, the defendant's

claims can be considered on appeal." *Id.* However, the court then appears to have

considered the claims on the merits, including claims based upon conduct at trial.

Respondent does not argue that the County Court did not decide this issue on the

merits, and thus, this court will also find that the state court decided the petitioner's

ineffective assistance of trial counsel claims on the merits, and will apply the

19

AEDPA standard of review to the County Court's decision.

The well-established Supreme Court precedent, provides that a claim of ineffective assistance of counsel can succeed only if counsel's representation fell below an objective standard of reasonableness, **and** there is a reasonable probability that, absent counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992), *cert. denied*, 508 U.S. 912 (1993). In applying this test, a reviewing court must be "highly deferential" and presume that counsel's conduct falls within the range of reasonable performance. *Strickland*, 466 U.S. at 689.

Petitioner in this case first claims that his attorney failed to object to the introduction of a "false rap sheet."[3] He includes as an exhibit a copy of the allegedly false rap sheet with items circled that he alleges are untrue. Petitioner's Ex. P. He states that the rap sheet gave him "new names"[4] and new crimes that he now claims he did not commit. However, the County Court held that there was no

---

[3] The court assumes that petitioner's "rap sheet" was discussed at sentencing, although there is no sentencing claim in this petition. In fact, the sentencing transcript reveals that petitioner was sentenced as a second felony offender, and he openly admitted the prior felony. Sentencing Transcript at 2. (Respondent's Ex. 4). The rap sheet is apparently mentioned only in conjunction with a claim of prosecutorial misconduct.

[4] The court would point out that the names that petitioner alleges are "not" him are listed under names used by subject. Petitioner's Ex. P.

evidence other than petitioner's allegation that any evidence was false. Petitioner's Ex. I at p.2. Petitioner has not rebutted this finding of fact with clear and convincing evidence as required under the AEDPA, thus, his attorney's alleged failure to object to the admission of this evidence (to the extent that it was ever admitted) was not unreasonable conduct.

Petitioner also claims that his attorney failed to "address" the semen in the condom and failed to object to the prosecution's assertion that a condom did not exist. Petitioner claims that counsel should have had the "condom" tested for DNA. There is absolutely *no evidence* that a condom with semen in it to test existed. It was clear that petitioner *claimed* that a used condom existed (in addition to the condom wrapper that was recovered), however, Officer Pratt testified that although he looked for a condom, one was *not* found. (T. 736-37).

Petitioner's theory is that if his attorney had requested DNA testing of this condom, it would have been discovered that it was not petitioner's semen, and therefore, someone else must have killed Ms. Sullivan. The County Court found that even if there had been a condom with semen in it, and the DNA did not match petitioner's, this would not have exonerated petitioner. Petitioner's Ex. I at 3. In fact, since much of the evidence showed that petitioner was unhappy that Ms. Sullivan had other men in the apartment, the fact that petitioner may have found

someone else's condom may have given him a greater motive to argue with Ms. Sullivan.  Additionally, there was clear evidence through both "Scoop" Neal's testimony and Kimberly Johnson's testimony that other men had been in the apartment on the day that Ms. Sullivan was killed.  Thus, counsel's failure to pursue the search for a condom that no one believed existed could not have been "unreasonable conduct."

Petitioner also claims that defense counsel failed to have the victim's body examined by an independent source and instead relied upon the prosecution's autopsy report.  Petitioner sets forth no evidence to show how this would have affected his case.  Although he argues that the medical examiner's report was false or "altered", the County Court found, there was no basis for this claim, other than petitioner's conclusory allegation.

Petitioner's theory is that because he did not initially receive a complete autopsy report, the report must have been fraudulent or "altered."  Petitioner argues that either someone else killed Ms. Sullivan or that she died because of her drug addiction and diabetes.  Petitioner believes that the toxicology report was altered to hide this fact.  However, the County Court noted in its decision that there was a preliminary autopsy that did not include a toxicology report, but that the report was eventually finalized *without substantive changes*. Petitioner's Ex. I at 3.

The exhibits that petitioner attached to his own motion to vacate completely support the County Court's finding and fail to support petitioner's allegations. Petitioner even included as an exhibit to his motion to vacate the FAX cover sheet from his attorney to Dr. Nicolas Forbes who was apparently reviewing the autopsy report for the defense. Exhibit G to Petitioner's Section 440.10 Motion to Vacate; Respondent's Ex. 5.  The cover sheet specifically states that the preliminary report is missing the toxicology results.  Petitioner did not, and does not in this habeas petition, specify how else the autopsy report was "fraudulent" or "altered".  Thus, he has not rebutted the County Court's finding by clear and convincing evidence that his allegations were not "supported by the record".   Thus, petitioner's attorney's alleged failure to pursue this claim was not unreasonable conduct.

Finally, petitioner claims that his attorney failed to interview a witness named "Manwala."  It is ***completely unclear*** who "Manwala" might be or what this person would have said on the stand.  There was never any mention of such an individual from any of the witnesses who testified, including petitioner's witnesses.  Thus, any alleged failure of petitioner's attorney to "interview" this witness cannot be the basis for a finding of ineffective counsel.

Based on the above, this court finds that the County Court's decision that petitioner's trial counsel was not ineffective was not contrary to, nor did it

23

unreasonably apply *Strickland* or any other well-established Supreme Court precedent.  Additionally the County Court decision was not an "unreasonable determination of the facts," and, in fact, was well-supported by the record evidence.  A review of the entire transcript shows that petitioner's counsel made appropriate arguments and objections to evidence.

The defense in the case was that petitioner did not commit the crime, but that it was committed by Cicero Dixon.  Counsel attempted to introduce evidence that would put doubt in the jury's mind about whether petitioner beat Ms. Sullivan, and instead show that Cicero Dixon made inculpatory statements to Kimberly Johnson and Timothy Kelly.  Counsel attempted to locate Mr. Dixon, but was unable to bring him to court, and instead did the best she could with the other witnesses, although she was not successful in her hearsay argument.[5]   The court would also point out that petitioner gave a ***voluntary statement***, indicating that ***he had beaten Ms. Sullivan***.  Although counsel did her best to minimize the effect of petitioner's statement and to show that the length of the questioning may have affected what petitioner stated to the police, clearly the jury did not believe this claim.  Petitioner's claim of ineffective trial counsel may be dismissed.

---

[5] Counsel attempted to argue that Mr. Dixon's statements to Ms. Johnson and Mr. Kelly were "declarations against penal interest" and thus an exception to the hearsay rule.  The court did not rule in counsel's favor.

**4. Prosecutorial Misconduct**

Petitioner claims that the prosecutor failed to "seek out the truth;" lied about there not being a condom; knew that the autopsy report was altered or fraudulent; and improperly introduced photographs of the victim, stating that all her bruises were sustained the night of her death.  Petitioner raised most of his prosecutorial misconduct claims in his state court motion to vacate.  He confuses some of the claims with evidentiary rulings made by the court, and includes both alleged trial court errors and prosecutorial errors in one point.[6]  This court will attempt to separate the claims that pertain to the prosecutor's conduct with claims that the trial court improperly allowed evidence to be admitted.  Petitioner raised most of the alleged ***trial court errors*** on direct appeal.  The state courts denied petitioner's claims on the merits, and therefore the AEDPA standard applies.

A federal court's review of a prosecutor's action on habeas corpus is very

_____

[6] There is one claim in petitioner's memorandum of law that is unclear, and it is also unclear whether he raised the issue in the state courts.  On page 22 of his memorandum, he states that reversal of his conviction was required where the prosecutor improperly called an investigator to rebut "defendant's alibi witness".  Petitioner does not specify any facts, does not indicate which "alibi witness" he is referring to, and does not state which investigator he claims was called to rebut the witness.  To the extent that petitioner did not raise every specific claim of prosecutorial misconduct in state court that he now mentions, this court is authorized under the statute to deny the claim even though it may not be exhausted. *See* 28 U.S.C. § 2254(b)(2).

limited.  Petitioner must prove that he suffered ***actual prejudice*** such that the prosecutor's misconduct "had a substantial and injurious effect or influence in determining the jury's verdict."  *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994), *cert. denied*, 516 U.S. 1152 (1996); *see also Brecht v. Abrahamson*, 507 U.S. 619, 637 (1992).  In evaluating whether petitioner has met his burden, three factors are relevant: (1) the severity of the prosecutorial misconduct; (2) any curative measures adopted to cure the misconduct; and (3) the certainty of conviction absent the misconduct.  *See id.*; *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998).

With respect to the alleged falsity of the autopsy report and the non-existent condom, as stated above, the County Court found that petitioner's claims were unsupported, and this court finds that petitioner has not come forward with clear and convincing evidence that the state court findings were erroneous.  Therefore a claim of prosecutorial misconduct cannot be based upon the prosecutor's alleged "knowledge" of "false" evidence.  Petitioner also states that the prosecutor introduced a "fraudulent" rap sheet, and there is no evidence to show that this is true.

With respect to the claim that the prosecutor improperly called an investigator to rebut petitioner's "alibi" witness, this court cannot even determine what petitioner is claiming, since the prosecutor did not call rebuttal witnesses, he

called *various* investigators, petitioner's counsel called four witnesses, and petitioner did not have an alibi, rather he claimed that someone else beat Ms. Sullivan while petitioner was sleeping in the same apartment.  Thus, it is impossible to determine what the petitioner's claim might be.

Petitioner's claim that the prosecutor did not "seek the truth" is equally vague.  The only claim to which the court can relate this is the fact that when defense counsel proposed Kimberly Johnson's allegedly exculpatory testimony, implicating Cicero Dixon, defense counsel asked for an adjournment so that the prosecution could investigate this alternative perpetrator. (T. at 440-46).  Defense counsel originally told the court and prosecutor that Cicero Dixon had admitted to Ms. Johnson beating and raping Ms. Sullivan. (T. at 441).  The prosecutor responded that "you know the victim wasn't raped?" (T. at 444).

The *court* denied counsel's request for an adjournment, and ultimately, the *court* excluded the hearsay statement made by Cicero Dixon.  When the court listened to the actual offer of proof by Kimberly Johnson, Dixon's alleged statement to her turned out not to be an actual admission that Mr. Dixon beat and raped the victim. (T. at 1033-35).  The court decided that Cicero Dixon's alleged statements to Ms. Johnson were not declarations against penal interest.  The court can only assume that petitioner's claim that the prosecutor failed to "seek the truth" relates to

this incident.  However, based on the evidence at trial, including testimony that Cicero Dixon was not in the area at the time,[7] petitioner's claim that any refusal to investigate rose to the level of prosecutorial misconduct is unsupported.

Petitioner has not even surpassed the first factor for the evaluation of prosecutorial misconduct.  He has not shown that the prosecutor committed misconduct at all, thus, the County Court's factual finding that the evidence was not false, and thus implicitly that the prosecutor did not introduce "false evidence" has not been rebutted by petitioner with clear and convincing evidence.  With respect to any claims of prosecutorial misconduct not addressed by the County Court, this court finds that the claims may be denied notwithstanding petitioner's failure to have raised the specific factual allegation in state court.  To the extent that petitioner claims trial court errors, they are discussed below.

## 5.  <u>Trial Court Error/Bias</u>

Petitioner claims that the trial court erred in ***excluding*** some of Kimberly Johnson's and Timothy Kelly's testimony.  Each defense witness was going to testify regarding something that Cicero Dixon told them the night of Ms. Sullivan's death.  After listening to an offer of proof regarding Ms. Johnson, the court ruled

---

[7] "Scoop" Neal testified that when he left the area at 11 p.m. on the night of August 1, 1995, Cicero Dixon was ***not*** there. (T. 932).

that the evidence was hearsay that did not come within any exception to the hearsay rule.  Petitioner also claims that the trial court improperly ***admitted*** testimony by ***prosecution*** witnesses after a *Molineaux/Ventimiglia* hearing.[8]  Petitioner claims that the court "injected" itself into the proceedings, conveying bias to the jury, and erred in "many" decisions about how to handle witnesses.

On appeal, petitioner presented two separate arguments related to the petitioner's prior bad acts.  Petitioner first claimed that the trial court erred in allowing hearsay evidence of allegations of physical abuse by the victim to third parties. Petitioner's Appellate Brief at pp.14-21.  Petitioner also claimed that the court erred in admitting the testimony of various witnesses who personally viewed instances of domestic violence or viewed the victim after these event. Petitioner's Appellate Brief at pp.21-28.  The Appellate Division found that the trial court ***did*** err in its ruling regarding the victim's statements to other parties, but found that the error was harmless.  Second, the Appellate Division found that the court did ***not*** err

---

[8] *People v. Ventimiglia*,  52 N.Y.2d 350, 420 N.E.2d 59, 438 N.Y.S.2d 261 (1981) provides for a hearing in which the court assesses the probative force and prejudicial effect of any uncharged crimes sought to be introduced at trial, and *People v. Molineaux*, 168 N.Y. 264, 61 N.E. 286 (1901) also provides for a hearing in which the court determines whether the prosecutor will be able to introduce evidence of prior uncharged crimes or bad acts by the defendant as affirmative proof at trial. *See Manning v. Walker*, 99-CV-5747, 2001 U.S. Dist. Lexis 109, *7 n.4 (E.D.N.Y. Jan. 3, 2001).

in admitting the evidence of witnesses that had personal knowledge of previous instances of domestic violence by petitioner against the victim.

Petitioner raised all issues except the claim of trial court bias in his direct appeal, and the Appellate Division decided them on the merits, so the AEDPA standard applies to those issues that were decided on appeal. Petitioner did not raise the claim of trial court ***bias***.  To the extent that the specific factual assertion may not have been raised and thus remains unexhausted, this court finds that it can be dismissed under section 2254(b)(2).

Basically, petitioner in this case is complaining about erroneous evidentiary rulings by the trial court judge.  Claims based on violations of state law are not generally cognizable on federal habeas review.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)(citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990))(additional citation omitted); *Hameed v. Jones*, 750 F.2d 154, 160 (2d Cir. 1984), *cert. denied*, 471 U.S. 1136 (1985).  It is not the province of a federal habeas court to re-examine state court rulings on evidentiary issues. *See Estelle v. McGuire*, 502 U.S. at 67 (1991); *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.), *cert. denied*, 525 U.S. 840 (1998).

Generally, erroneous evidentiary rulings by a state court do not rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. *Ayala v. Leonardo*, 20 F.3d 83, 91 (2d Cir.), *cert. denied* 513 U.S. 888

(1994).  A writ may issue only in situations where an evidentiary ruling has rendered a trial fundamentally unfair. *Dunnigan v. Keane*, 137 F.3d at 125; *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.); *cert. denied* 464 U.S. 1000 (1983).

The erroneous ***admission*** of unfairly prejudicial evidence will constitute a denial of due process only if the evidence is "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan v.* Keane, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)(internal quotation marks omitted).  In short, the evidence must have been crucial, critical or highly significant. *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985).  The erroneous ***exclusion*** of evidence will rise to the level of a constitutional violation if the evidence was "material" to the presentation of the defense in that it created a reasonable doubt that did not otherwise exist. *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983).

The Appellate Division did not unreasonably apply or act contrary to federal law when it determined that there was no error in the exclusion of the hearsay from petitioner's witnesses, and any error in the admission of hearsay regarding things that the victim told others about petitioner's abuse was harmless since the erroneously admitted statements were cumulative of the evidence of the witnesses' direct observation of petitioner's previous abuse.

31

Petitioner wanted to introduce testimony from Kimberly Johnson and from Timothy Kelly that Cicero Dixon made some admissions to them regarding the victim on the night she was killed.  The court found the Dixon's comments were not declarations against penal interest under state law, and noted that even Kimberly Johnson testified during the voir dire that she did not interpret Mr. Dixon's statements as an admission that he killed the victim.  The court also found that the fact that petitioner's private investigator could not locate Mr. Dixon did not make him "unavailable" sufficient to justify the admission of the Johnson and Kelly testimony.  Since this was not an "erroneous ruling", the court need not determine whether the exclusion of the evidence rendered the trial unfair.

With respect to the victim's hearsay statements, the Appellate Division did find that the trial court erred in admitting testimony from third parties about what the victim told them about petitioner's abuse.  However, witnesses also testified about incidents in which they personally saw the petitioner hit Ms. Sullivan, thus the admission of the hearsay testimony did not remove a reasonable doubt that would have otherwise existed without the admission of the testimony.

The Appellate Division's ruling regarding the admission of testimony

regarding prior incidents of domestic violence in general[9] also did not violate the

AEDPA standard.  This ruling was purely a state law ruling that the evidence was

more probative than prejudicial, and was relevant to establish the defendant's

motive and intent.

With respect to petitioner's claim that the court showed bias against him,

petitioner does not specify to what incidents he is referring.  The fact that the court

ruled against petitioner does not show bias, and petitioner points to no other facts

that would establish his claim.  Petitioner does allege that the trial court forced

defense counsel to use her peremptory challenges instead of dismissing three jurors

for cause.

It is well-settled that a defendant has the Sixth and Fourteenth Amendment

right to an impartial jury. *Morgan v. Walsh*, 2003 U.S. Dist. LEXIS 14813, *6

(S.D.N.Y. Aug. 27, 2003)(citing *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988)).

However, the Supreme Court in *Ross* "reject[ed] the notion that the loss of a

peremptory challenge constitutes a violation of the constitutional right to an

impartial jury." *Ross*, 487 U.S. at 88.  A defendant's constitutional rights will not be

_____

[9] This court is referring to the witness's personal observations of domestic
violence such as David Hannah's testimony that in the summer of 1995, he saw
petitioner strike Ms. Sullivan, (T. 113, 114-15), or Cheryl Sullivan's (the victim's
sister) testimony that she witnessed petitioner break into her apartment and drag the
victim out, punching her in the face. (T. 132).

violated as long as the jury that was ultimately selected was fair and impartial. *Morgan v. Walsh, supra* (citations omitted).

In this case, on appeal, the petitioner claimed that the court erred in denying challenges for cause for jurors Larry Taylor, John Ziemann, and Charles Togias. Petitioner's Appellate Brief at pp. 46-50.  Although petitioner's peremptory challenges were ultimately exhausted, petitioner had sufficient challenges to exclude all three of these individuals from sitting on the jury.

Neither counsel on appeal, nor petitioner in this habeas action argued that the jury that was ultimately impaneled was not impartial.[10]  Since none of the challenged jurors sat on the jury, and petitioner did not argue that he would have used additional peremptory challenges for another juror after his peremptories had been exhausted, the claim does not rise to the level of a constitutional violation. The Appellate Division merely stated that it agreed with the trial court's refusal to excuse the three jurors for cause.  The Appellate Division did not act contrary to federal law when it made this decision. Thus, this court finds that petitioner's claim of prosecutorial and trial court error must be dismissed.

--------

[10] Apparently, the fact that petitioner exhausted his peremptory challenges preserved this issue on appeal, even though none of the jurors of which petitioner complained actually sat on the jury. *See* Petitioner's Appellate Brief at p.49.

34

## 6. **Appellate Counsel**

Petitioner claims that his appellate attorney was ineffective because she failed to raise claims that petitioner wanted her to raise. Petitioner raised this claim in an application for writ of error *coram nobis* which was denied by the Appellate Division without opinion, and thus, the court assumes that the decision was on the merits. Thus, the AEDPA standard applies.

The *Strickland* test also applies to claims of ineffective assistance of appellate counsel. *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)(applying the *Strickland* test to appellate counsel). Thus, the petitioner must show that his appellate attorney's performance "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688. An appellate attorney, however, is not required to raise every nonfrivolous argument,[11] and in order to establish **constitutionally** ineffective assistance of counsel, the petitioner must show that appellate counsel omitted "significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson*, 13 F.3d 528, 532 (2d Cir. 1994).

A review of the record in this case shows that the Appellate Division did not violate the AEDPA when it denied petitioner's ineffective assistance of appellate

---

[11] *Jones v. Barnes*, 463 U.S. 745, 754 (1983).

counsel claim. Petitioner's exhibits in this case include letters that he received from appellate counsel. Petitioner's own exhibits make it clear that appellate counsel was carefully reviewing the record and explained to petitioner why she was not raising other issues that petitioner may have wanted to include. Petitioner's Ex. D. Appellate counsel even sent petitioner a draft of the appellate brief so that he could comment on the issues. Petitioner's Ex. B.

In the letter, dated September 1, 1999, enclosing a copy of the draft of the appellate brief, appellate counsel told petitioner that she had considered whether to raise the ineffective assistance of trial counsel claim, but determined not to include it. *Id.* She also informed petitioner that he was free to submit a supplemental brief of his own even without court approval. Given this court's finding regarding ineffective assistance of trial counsel, appellate counsel's decision not to include that claim in the appellate brief was not unreasonable.

A review of the issues that counsel did raise (the evidentiary and juror claims), and the fact that the Appellate Division agreed with one of the arguments, even though the appellate court found that the error was harmless, shows that counsel raised appropriate arguments on appeal, and the fact that she did not raise the claims that petitioner wished to raise did not render counsel's assistance ineffective. Thus, petitioner's claim of ineffective assistance of appellate counsel

may be dismissed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the petition be **DENIED** and **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

ten days within which to file written objections to the foregoing report.  Such

objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO**

**THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE**

**REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v.*

*Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: April 30, 2004

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

37